PIM, *Appellant,* v. THE CITY OF ST. LOUIS *et al.*

Division Two, June 12, 1894.

1. **Statute of Limitations:** ANCESTOR: HEIR.   Where the statute of limitations begins to run in the lifetime of the ancestor it will continue to run against an heir who is a *feme covert,* or laboring under other statutory disability, at the time of the ancestor's death.

2. ————: ADVERSE POSSESSION. Adverse possession of land by a dock company is not interrupted because any particular spot may have been temporarily vacant, if the limits of the possession were clearly defined.

3. Evidence: EXISTENCE OF ISLAND: SURVEY. The existence of an island at a particular time can be shown by proof of its survey at that time by the surveyor general.

4. Practice: VACATING JUDGMENT BY DEFAULT: PRESUMPTION. It will be presumed that an interlocutory judgment by default against one of the defendants was set aside before judgment was rendered in his favor at the trial.

*Appeal from St. Louis City Circuit Court.*—HON. L. B. VALLIANT, Judge.

AFFIRMED.

*Leverett Bell, George J. Davis* and *Henry B. Davis* for appellant.

(1) The plaintiff is not barred by limitation. *Dyer v. Wittler*, 89 Mo. 81; *Bradley v. Railroad*, 91 Mo. 498. (2) The evidence establishes that the land sued for was created by accretion to the Missouri shore of the river. *Campbell v. Laclede Co.*, 84 Mo. 372; *St. Clair Co. v. Livingston*, 23 Wall. (U. S.) 66; *St. Louis v. Railroad*, 114 Mo. 13; *St. Louis v. Lemp*, 93 Mo. 477; *Public Schools v. Risley*, 40 Mo. 356; *LeBeau v. Gaven*, 37 Mo. 556; *Smith v. Public ·Schools*, 30 Mo. 290; *Benson v. Morrow*, 61 Mo. 345; *Jones v. Soulard*, 24 How. (U. S.) 41; *Myers v. St. Louis*, 82 Mo. 367. (3) The title under the Brazeau concession extended to the Mississippi river on the east, and covered all land to the water's edge, and the city could not, nor could any person, by filling or by building dykes, deprive the plaintiff of her riparian rights. *Railroad v. Illinois*, 146 U. S. 387; *St. Louis v. Rutz*, 138 U. S. 226; *Wilkinson v. Dock Co.*, 102 Mo. 140. (4) There was no proof whatever of the existence of Duncan's island in 1835

(the date of the deed from Theodore Papin to Honore Picotte), and defendants' instructions numbers 1, 2 and 3, presenting this fact in connection with other facts as a basis for a verdict for defendants was erroneous. *Stone v. Hunt*, 114 Mo. 66; *Gorham v. Railroad*, 113 Mo. 408. (5) The proceedings to open the south wharf in St. Louis under ordinance 5403, are held by this court to be absolutely void, and it was error in the court below to permit them to be read to the jury. *Wilkinson v. Dock Co.*, 102 Mo. 140. (6) A complete record title from the Spanish government in 1786, by inheritance and proper conveyances, is shown in plaintiff. (7) The city of St. Louis, the St. Louis Sectional Dock Company (respondents here), the Iron Mountain Railroad Company, and none of them, have any interest in or right to the premises in controversy, or any part thereof, by deed, possession, or in any manner whatsoever.

*W. C. Marshall* for respondent, City of St. Louis.

(1) Defendant's title by limitation began in 1858 during the lifetime of plaintiff's father, and has been continuous ever since; hence defendant has acquired title by limitation. (2) The land in controversy never was part of lot 2 of the United States survey 3078, nor is it an accretion thereto, but it is made up partly of what was formerly Duncan's Island and partly by filling the eastern half, beyond the thread of the slough or channel, which separated Duncan's Island from the main land.

BURGESS, J.—Ejectment for the possession of an undivided one-half interest in a lot of land in front of block 868 of the city of St. Louis, and between it and the Mississippi river, bounded east by said river, west

by the east line of block 868, south by the north line of Trudeau street produced to the river, and north by the south line of Russell avenue produced to the river, and having a width from east to west of about three hundred feet, and a length from north to south of about three hundred and forty-six feet and six inches. The city answered, *first*, by general denial; *second*, claiming adverse possession since 1868, and a plea of the statute of limitations. Plaintiff, by way of reply, denied all the allegations in the answer. The St. Louis Sectional Dock Company made no appearance, and judgment, by default, was rendered against it on February 4, 1892. Upon a trial to a jury there was a verdict and judgment for the defendant from which plaintiff appealed to this court.

In 1786, Jos. Brazeau obtained a concession of a tract of ten arpens from north to south, bounded on the east by the Mississippi river. In 1799, he obtained a second concession. The concession was confirmed by act of congress in 1836. Plaintiff showed a derivative title from Jos. Brazeau for the land sued for, known as the Picotte tract, the north and south line of which, if extended eastwardly to the west bank of the Mississippi river as now defined, would include said land.

It is further shown that Honore Picotte owned lot 2 at the time of his death in 1860; that his wife died in 1869; that two children of said marriage survived their parents, of whom plaintiff is one, and her sister, a Mrs. Wilkinson, is the other; that plaintiff was married in 1865 to Dr. L. T. Pim, who died in 1888. The will of Honore Picotte was introduced in evidence by which all of his property, real and personal, was devised to his wife for life, with remainder in fee to the plaintiff and her sister, Mrs. Wilkinson.

The Brazeau tract is embraced in United States survey 3078, and plaintiff claims that the land in controversy is an accretion to that survey and particularly to lot 2. Upon the other hand, defendant claims that it is not an accretion but that it was formed by the city permitting the Iron Mountain Railroad Company to construct a trestle in the river in front of said survey, and thereafter by the railroad company, and the city, and the Sectional Dock Company, as the lessee of the city, filling up where the trestle ran, and finally filling the low ground between the embankment thus formed and what was known as Duncan's Island.

In 1835 the main channel of the river as shown by said survey was between Duncan's Island and the Missouri shore. The land sued for lies east of the channel as it was at that time. By filling up, Main street has been built in front of what was the eastern boundary of said survey and the wharf has been created in part by filling done by defendant and partly by taking in Duncan's Island. From 1870, to January 1, 1889, the Sectional Dock Company occupied the premises as the lessee of defendant city. There was also evidence that in 1884 the city of St. Louis rented the premises to the St. Louis Sectional Dock Company. In 1884, the city, by ordinance, granted permission to the St. Louis Transfer Railway Company to lay its tracks along the property. An amended franchise for the same purpose was granted said St. Louis Transfer Railway Company in 1885.

On the seventeenth day of June, 1870, plaintiff and her sister, Mrs. Wilkinson, by a deed in partition, divided block 868, and described it as follows, in the fifth paragraph of the deed:

"The north half of block 868 of said city of St. Louis, bounded east by the wharf, west by Main street, north by Picotte street, and south by the balance of

the block," and by paragraph six, bounded the south-ern half of the block in the same way, the northern half being partitioned to Mrs. Wilkinson, and the southern half to Mrs. Pim.

The city showed by Thomas P. Morse that he had known the property in controversy intimately since June or July, 1858, and had seen it every day, except during the years 1869 to 1873; that in 1858 it was about two blocks from where the river was then to where it is now, that is, two blocks have been added since; that the city first constructed dykes from the main land to Duncan's Island, and subsequently, filled in between the dykes, thus connecting Duncan's Island with the main land; that the Sectional Dock Company built houses or buildings on the property in 1864; that in 1858 the Sectional Dock Company built houses or buildings partly in front of block 868, and partly further north; that the company used the property from 1858 to 1864, and then bought an old machine shop which had been erected in 1859 partly in front of block 868; that it was subject to overflow in an ordi-nary stage of water, and that the Sectional Dock Com-pany built cribs for the purpose of keeping their lumber above the water; that at that time Kosciusko street was the nearest street to the water's edge (Kosciusko street is the next block west of Main street); that from 1858 to 1864 the office of the Sectional Dock Company was on the lower part of Duncan's Island; that from Lesperance street to Barton street in 1858, the river was from one hundred to two hundred feet wide between the Missouri shore and Duncan's Island; that a portion was not filled until the Iron Mountain Railroad com-menced filling in 1882 to 1883 and was only completely filled a few years ago; that the city drove piling at Lesperance street where an eddy was forming, and which threatened to wash away what was originally

part of survey 3078, and thereby prevented such washing, and the Iron Mountain Railroad hauled dirt and filled up the slough; that the old machine shop which the Sectional Dock Company purchased was located between Russell avenue and Trudeau street; that the Sectional Dock Company had been paying rent to the city for the property since 1858; that the city connected Duncan's Island with the main land by building dykes at Barton and at Lesperance streets, and then filled in between the dykes; that the Sectional Dock Company under its lease from the city piled lumber on block 868 in 1858 by building cribs to raise the lumber above the water, then filled up the slough between Duncan's Island and the main land.

The city showed by Henry Atkins, superintendent of the St. Louis Sectional Dock Company, that he had been connected with that company, beginning in 1856 and extending to the present time; that he knew Duncan's Island in 1845 or 1846; that in 1845 in medium stage of water the boats ran between the main shore and Duncan's Island; that at the time the Iron Mountain trestle was built there were four, five, or six feet of water between the island and the main land; that the trestle extended from Lesperance street to Barton street; that the trestle was constructed about one hundred feet from the east bank of the slough and extended over the slough; that the filling was done by the Iron Mountain Railroad bringing dirt from Picotte's hill in Carondelet and filling up the slough, and by the Sectional Dock Company also doing filling; that the Sectional Dock Company has been in possession of this property since 1858 as lessee of the city.

August Rauchenbauch testified that he had been in the employ of the city since 1854; that in 1865 he made a survey and location for the wharf lines south of Chouteau extending as far south as Keokuk street;

that at that time there was a slough between Picotte and Trudeau streets and there were several frame buildings south of Lesperance street; near the water's edge, about eleven feet, eight inches from the river bank, was a machine shop sixty-five feet, six inches by thirty-five feet, that was used by the Dock Company at the time; then sixty feet from that there was a frame house thirty-two feet, four inches by sixteen feet, three inches, that was the office of the dry office; then, sixty-five feet, six inches from it further west was a frame stable that the heavy red line on a map used to illustrate the location of the property and surroundings, hereto. annexed, indicates the proposed east line of the water as fixed by ordinance 5403, passed in August, 1864, and the red line west of that indicates the west wharf line three hundred feet from the east line.

Geo. W. Ford, testified that he had known Duncan's Island since 1846, and that in 1846 he came up the river to St. Louis and the boat passed between Duncan's Island and the Missouri shore.

Mrs. Celestine Pim, being recalled on behalf of the defendants, testified as follows:

"*Q.* Will you please state to the jury the day of the month and year you were born? *A.* May 3, 1842.

"*Q.* Will you please state the day and the year and the month when you were married? *A.* The sixth of December, 1865."

At the instance of the plaintiff the court instructed the jury as follows:

"1. The court instructs the jury that the wharf condemnation proceedings, read in evidence, were void, and invested the city of St. Louis with no title or claim to the property sued for.

"2. If the jury find for the plaintiff, they will find that she is entitled to the possession of one undivided

Mississippi River

Red Lines
Black Lines

half of the premises, and damages for the detention thereof, from January 15, 1892, to the present time, and the jury will state in their verdict the value of the monthly rents and profits of said one-half interest."

The following instructions were given on the part of the defendants:

"1.   The court instructs the jury that an island in the Mississippi river is a body of land surrounded by water. If, therefore, they believe from the evidence that what was formerly called Duncan's Island was, at the date of the deed from Papin to Honore Picotte, a body of land in the Mississippi river, separated from the main shore by a channel or slough through which water flowed, it was in fact an island, though at times, when the river was below its ordinary low-water stage, water ceased to flow through said channel or slough.

"2.   The court instructs the jury that if they believe from the evidence that at the date of the deed from Theodore Papin to Honore Picotte, what was formerly called Duncan's Island was in reality an island, as defined in these instructions, and that it was situated directly east of the property described in said deed, and that the property sued for lies east of where the middle line of the said channel or slough which separated the island from the main land was, and became attached to said Duncan's Island by accretion thereto, or was a part thereof, they will find for the defendants.

"3.   If the jury believe from the evidence that, at the date of the partition deed to Papin, and of Papin to Honore Picotte, the lower end of Duncan's Island lay above the north line of the property described in the deed from Papin to Honore Picotte on the main line extended eastwardly, and that the property in dispute is not an accretion to the said property described

in said deed to Honore Picotte, but an accretion to said island, they will find for the defendants.

"4.   The court instructs the jury that by the term accretion herein used is not meant filling done by the city, the Sectional Dock Company or the Iron Mountain Railroad Company, but accretion means natural accumulations; and, if the jury believe from the evidence that the property here sued for was made by the city, the Sectional Dock Company, or the Iron Mountain Railroad Company filling up the slough between Duncan's Island and the main land of the Missouri shore, and not by natural accumulations, then their verdict must be for the defendants.

"5.   The court instructs the jury that if they believe from the evidence that the defendant St. Louis Sectional Dock company, during the lifetime of Honore Picotte, entered upon the land sued for and actually and wholly occupied the same in their business, and from the time of said first occupation so occupied the same continuously for ten consecutive years, holding same throughout such period openly, peaceably, exculsively and adversely to all persons, claiming it in good faith as their own or as tenants of the defendant, the city of St. Louis, then the defendants, have acquired title thereto by the statute of limitations, and you will find for the defendants.

"6.   The court instructs the jury that, if they believe from the evidence that the possession of the city, through the Sectional Dock Company, began during the lifetime of Honore Picotte, and was open, adverse, continuous and notorious, as described in the other instructions given, then the subsequent death of said Picotte during the minority or coverture of the plaintiff herein, did not have the effect of stopping the running of the statute of limitations, and if such possession of the city continued ten years before the insti-

tution of this suit, then their verdict must be for the defendants.

"7. The jury are instructed that in the instructions in reference to the defendants acquiring title to the property in dispute by statute of limitations, it is not meant that every foot of said land must have been continuously occupied for ten years at all times, but that the occupation must have been of such a kind, evidenced by an inclosure, or by visible token of possession, clearly defining the limits of possession, and calculated to give notice to the owner, and such that in itself excluded and was inconsistent with the possibility of any person, at the same time occupying and using the land, or any part thereof, adversely to the defendants, and if the occupation was of such a nature, it did not cease to be continuous, because, by reason of changing piles of lumber, or otherwise, any particular spot thereof became temporarily vacant and unused, and that such adverse possession must be made out by clear and positive proof."

It is claimed by counsel for plaintiff that her cause of action was not barred by the statute of limitations at the time of the commencement of this suit, and that it did not begin to run against her until the death of her husband, Dr. Pim, which occurred in 1888. If there was no actual possession taken of the land until after her marriage to her husband in 1865, her action was not barred, because it was brought within ten years after his death. *Bradley v. Railroad*, 91 Mo. 493; *Dyer v. Witler*, 89 Mo. 81. The statute did not run against her during her coverture unless possession was taken before her marriage, although the title in fee was vested in her. But the evidence tends to show that possession was taken by defendant city in 1858, during the lifetime of Honore Picotte, plaintiff's father, and from whom she acquired whatever title she had by

devise to which the land here sued for had accreted. The evidence was ample upon which to predicate the instructions given for defendants upon that theory of the case. As the statute of limitations began to run against plaintiff's father, it continued to run against her, notwithstanding she may have been under some statutory disability during a portion or all of the time. *Rogers v. Brown*, 61 Mo. 187; *Cunningham v. Snow*, 82 Mo. 587.

There is no material difference in the facts as disclosed by the record in this case and the case of *Wilkinson v. St. Louis Sectional Dock Co.*, 102 Mo. 130, in which case the instructions 5 and 7 here complained of were approved. The plaintiff in that case was a sister to the plaintiff here, acquired her title from the same source, and one of the defendants here was the defendant in that. We think that case decisive of this in so far as the question of the statute of limitations is concerned. Instruction number 6, given for defendant, is in line with that decision.

If the plaintiff's cause of action was barred by the statute of limitations, as the jury must have found under the facts and instructions of the court, it is of no consequence that the land in controversy may have accreted to that which plaintiff acquired from her father by will.

It is further contended that there was no proof of the existence of Duncan's island in 1835, and that for that reason there was no proof upon which to predicate defendants' first, second and third instructions, and they should not have been given. This contention is not borne out by the record, as the plat therein shows that Duncan's Island was surveyed by the surveyor general in 1835. This objection is not, therefore, well taken.

The plaintiff insists that, as there was an interlocu-

tory judgment rendered by default against the Dock Company on February 4, 1892, which was not set aside; and on July 18, 1892, a judment in favor of the Dock Company on the trial, she is entitled to judgment against the Dock Company on the record. This contention seems somewhat technical and would not justify a reversal of the judgment upon that ground alone. Section 2100, Revised Statutes, 1889, reads as follows: "The court shall, in every stage of the action, disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect." We are not prepared to say that the substantial rights of the plaintiff were affected by the failure to set aside the interlocutory judgment in favor of the plaintiff, even if it had not been done.

But, nothing to the contrary appearing from the record, it will be presumed that the interlocutory judgment was set aside before the final judgment was rendered. *Blair v. Railroad*, 89 Mo. 383. The judgment should be affirmed. It is so ordered. All of this division concur.